# EXHIBIT A

To order this form, call (517) 337-1211
Target Information Management, Inc.

Approved, SCAO

Original - Court
1st copy - Defendant

2nd copy - Plaintiff
3rd copy - Return

| STATE OF MICHIGAN | | CASE NO. |
|---|---|---|
| JUDICIAL DISTRICT | SUMMONS AND COMPLAINT | 09-156 CH |
| 22nd JUDICIAL CIRCUIT | | David S. Swartz |
| COUNTY PROBATE | | 734-222-3383 3001 |

**Court address**
101 E. Huron, Ann Arbor, MI 48104

**Plaintiff's name(s), address(es), and telephone no(s).**
Beatriz H. Coleman and
John T. Coleman
9464 N. Platt Rd.
Milan, MI 48160
734-429-1346

v

**Defendant's name(s), address(es), and telephone no(s).**
Chase Bank USA, NA
300 Tice Blvd
Woodcliff Lake, NJ 07677
Chase Home Finance LLC
10790 Rancho Bernardo Rd
San Diego, CA 92127

**Plaintiff's attorney, bar no., address, and telephone no.**
Beatriz H. Coleman (P40188)
9464 N. Platt Rd
Milan, MI 48160
734-429-1346

**SUMMONS   NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons to **file a written answer with the court and serve a copy on the other party** **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state). (MCR 2.111[C])
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued | This summons expires | Court clerk |
|---|---|---|
| | May 8, 2009 | |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

**COMPLAINT** *Instruction: The following is information that is required to be in the caption of every complaint and is to be completed by the plaintiff. Actual allegations and the claim for relief must be stated on additional complaint pages and attached to this form.*

**Family Division Cases**
☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.
The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

**General Civil Cases**
☒ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.
The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

**VENUE**

| Plaintiff(s) residence (include city, township, or village) | Defendant(s) residence (include city, township, or village) |
|---|---|
| Milan MI, Washtenaw County | Conducts Business, Washtenaw County MI |

**Place where action arose or business conducted**
Milan, MI   Washtenaw County

| Date | Signature of attorney/plaintiff |
|---|---|
| 2/11/09 | |

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

MC 01  (3/08)  **SUMMONS AND COMPLAINT**  MCR 2.102(B)(11), MCR 2.104, MCR 2.105, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206(A)

DEFENDANT

EXHIBIT
A

ALL-STATE LEGAL

# STATE OF MICHIGAN
## IN THE 22nd CIRCUIT COURT FOR WASHTENAW COUNTY

Beatriz H. Coleman and
John T. Coleman
    Plaintiffs,

V

Case No: *09 - 156 CH*
Hon: *David S. Swartz*

Chase Bank USA, N.A. and
Chase Home Finance, LLC
    Defendants.

/

| | |
|---|---|
| Beatriz H. Coleman (P40188) | Trott & Trott, PC |
| Attorney for Plaintiffs | Attorney for Defendant |
| TILA Attorney Group, PLLC | 31440 Northwestern Hwy, Suite 200 |
| 9464 N. Platt Rd. | Farmington Hills, MI 48334 |
| Milan, MI 48160 | Phone: 248.642.2515 |
| Phone: 734.429.346 | Fax: 248.642.3628 |
| Fax: 802.280.3119 | |

/

## EMERGENCY EX-PARTE
## ~~TEMPORARY RESTRAINING~~ ORDER
## *SHOW CAUSE*

At a session of said Court held in the Courthouse
City of Ann Arbor, County of Washtenaw,
State of Michigan on February *6* , 2009

### PRESENT: HONORABLE *David Swartz*

The court has reviewed Plaintiffs' motion for a an emergency ex-parte Temporary Restraining Order, and other pleadings submitted by Plaintiffs and has determined the following:

*may suffer*

*OK*

1.   Plaintiffs' ~~will suffer~~ irreparable harm and loss if Defendant ~~is~~ permitted to finalize its foreclosure process against their home. as Plaintiffs will be displaced from their home prior to a hearing on their claims.

2.   An order has been granted without notice because the redemption period on the subject property is one day away from expiring, and Defendant will soon seek to evict Plaintiffs from their home, and any further delay to effectuate notice could cause Plaintiffs to be displaced prior to their claims being heard.

1

IT IS ORDERED:

1.  Defendant is enjoined and restrained, whether alone or in concert with others, including any officer, agent, representatives, and/or employee of Defendant, until further order of this court, from finalizing its foreclosure process against Plaintiffs' home.

2.  This Order shall remain in full force and effect until this court specifically orders otherwise.

3.  Plaintiff shall show cause before this court on *February 25, 2009*, at *1:30 PM* a.m./p.m., or as soon thereafter as counsel may be heard, why a preliminary injunction should not be ordered according to the terms and conditions as set forth.

4.  Temporary Restraining Order is issued at *4* a.m./p.m. on February *6*, 2009.


Honorable *David Swartz*
Circuit Court Judge


Respectfully Submitted,


/s/ Beatriz H. Coleman, Esq
Beatriz H. Coleman, Esq. (P10488)

2

## STATE OF MICHIGAN
### IN THE 22nd CIRCUIT COURT FOR WASHTENAW COUNTY

Beatriz H. Coleman and
John T. Coleman
    Plaintiffs,

v.

                              Case No: 09 - 156 CH
                              Hon: David S. Swartz

Chase Bank USA, N.A. and
Chase Home Finance, LLC
        Defendants.

_____/

Beatriz H. Coleman (P40188)       Trott & Trott, PC
Attorney for Plaintiffs            Attorney for Defendant
TILA Attorney Group, PLLC     31440 Northwestern Hwy, Suite 200
9464 N. Platt Rd.             Farmington Hills, MI 48334
Milan, MI 48160               Phone: 248.642.2515
Phone: 734.429.346          Fax: 248.642.3628
Fax: 802.280.3119

_____/

### NOTICE OF HEARING FOR MOTION FOR PRELIMINARY INJUNCTION ORDER AND ORDER TO SHOW CAUSE

**PLEASE TAKE NOTICE** that Plaintiffs have filed the above motion and related papers with the Court seeking an order Preliminary Injunction Order and Order to Show Cause **PLEASE TAKE FURTHER NOTICE** that a hearing will take place on *February 25* , 2009 at *1:30* am/ p.m. p.m. regarding the above matter.

Dated: 2/6/09                     _____

                                   *Beatriz H. Coleman, Esq.*

### Certificate of Service

    I, Beatriz H. Coleman, certify that I am over the age of 18 and that on February 6 , 2009, I served a copy of the foregoing Notice of Hearing by CERTIFIED MAIL, RETURN RECEIPT REQUESTED, by placing said pleadings in an envelope, addressed to the below person(s):

1

Chase Home Finance, LLC
10790 Rancho Bernardo Road
San Diego, CA 92127.

Chase Bank USA, N.A.
300 Tice Blvd.
Woodcliff Lake, NJ 07677.

Trott & Trott, PC
Attorney for Defendant
31440 Northwestern Hwy, Suite 200
Farmington Hills, MI 48334-2525
Fax: 248.642.3628

Dated: 2/6/09

Beatriz H. Coleman, Esq. (P40188)

2

**STATE OF MICHIGAN**
**IN THE 22nd CIRCUIT COURT FOR WASHTENAW COUNTY**

Beatriz H. Coleman and
John T. Coleman
    Plaintiffs,

                    Case No:  09- 156 CH

V                       Hon:

Chase Bank USA, N.A. and
Chase Home Finance, LLC
    Defendants.

RECEIVED

FEB - 6 2009

Washtenaw County
Clerk/Register

---

| | |
|---|---|
| Beatriz H. Coleman (P40188) | Trott & Trott, PC |
| Attorney for Plaintiffs | Attorney for Defendant |
| TILA Attorney Group, PLLC | 31440 Northwestern Hwy, Suite 200 |
| 9464 N. Platt Rd. | Farmington Hills, MI 48334 |
| Milan, MI 48160 | Phone: 248.642.2515 |
| Phone:  734.429.346 | Fax: 248.642.3628 |
| Fax: 802.280.3119 | |

---

There is no other pending or resolved civil action arising out of the
transaction or occurrence alleged in the complaint.

**COMPLAINT AND JURY DEMAND**

Now Come Plaintiffs, Beatriz H. Coleman and John T. Coleman, by and through TILA

Attorney Group, PLLC.  In their Complaint against Chase Bank USA, N.A. and Chase

Home Finance, LLC, Plaintiffs allege serious breaches of their fiduciary duties,

violations of the Michigan Consumer Mortgage Protection Act MCL 445.901-445.922,

violations of the Michigan Mortgage Brokers, Lenders and servicers Act MCL 445.1651-

445.1684, common law fraudulent inducement, misrepresentation, and related claims for

equitable relief.  Plaintiffs seek injunctive relief to stay foreclosure proceedings and

1

potential eviction proceedings pending resolution of their equitable claims to set aside the foreclosure, to rescind the mortgage, to quiet the title pursuant to MCL 600.605 and MCL 600.2932, and for money damages and attorney fees.

## PARTIES

2.   Plaintiffs, Beatriz H. Coleman and John T. Coleman, have resided for over 10 years at 9464 N. Platt Rd., Milan, MI 48160, Washtenaw County.

3.   Defendant, Chase Home Finance, LLC, (hereinafter CHF) conducts business in Washtenaw County, Michigan.  The address for CHF is: 10790 Rancho Bernardo Road, San Diego, CA 92127.

4.   Defendant, Chase Bank USA, N.A. (hereinafter "Chase Bank")is a national association, and conducts business in Washtenaw County, MI.  The address for Chase Bank 300 Tice Blvd., Woodcliff Lake, NJ 07677.

## JURISDICTION

5.   This court has jurisdiction over this matter since the amount in controversy exceeds $25,000 and the Plaintiffs seek injunctive relief; moreover, this court has jurisdiction over Plaintiffs' quiet title claims pursuant to MCL 600.605 and MCL 600.2932.

## VENUE

6.   Washtenaw County, Michigan is the proper venue for this action since Plaintiffs reside there, and their home, the subject of this litigation, is located there. Moreover, the Defendant conducts business in Washtenaw County, Michigan.

## FACTUAL BACKGROUND

2

7.  On or about August 31, 2005, Plaintiffs entered into a mortgage with Chase Bank for (See Exh A attached). Said mortgage was given to secure a promissory note in the amount of $414,580.00, being loan#: 1890177580. (See Exh B attached). The current servicer for the subject loan is CHF, loan#: 21027834.

Plaintiff employed the services of CLS Lending Concept, LLC (hereinafter "CLS Lending") located at 28131 Newport, Warren, MI 48098 to obtain the loan. The mortgage loan originator was William Jaber, who was completely new to the mortgage business. William Jaber worked under a supervisor, and relied on him in all aspects of the subject loan. This supervisor was the person with whom all aspects of the loan were conducted. Plaintiff, Beatriz Coleman expressed to both William Jaber and his supervisor that under no circumstances would she enter into an adjustable rate mortgage (hereinafter "ARM"). She further stressed that no loan would take place if an adjustable rate of interest were used. She was assured repeatedly that this would not happen. Additionally, William Jaber's supervisor faxed a note to Plaintiff, Beatriz H. Coleman, stating that the interest only interest rate would be 5.875%, during the interest only period, and would then remain at a fixed rate of 6.875% thereafter. (See Exh C attached)

Despite all these representations, Plaintiffs were put into a 2/28 ARM at closing. As Plaintiffs were both unfamiliar with mortgage practices and lending terms, they relied on the representations made by CLS Lending. As such they did not realize at the time of closing that they had been put into an adjustable rate mortgage. It was not until two years after closing, when the interest rate adjusted, that Plaintiffs became aware of the ARM.

Prior to the interest rate re-setting, Plaintiffs experienced financial problems due to the fact that CLS Lending did not use the correct amount of property taxes for the

3

escrow analysis. This despite the fact that CLS Lending was provided with accurate property tax statements, and Plaintiffs' tax liability had not changed. The annual property taxes were grossly understated in order to make the monthly payment appear less than what it actually would have been, had the property tax liability been correctly stated. As a result, the escrows account was insufficient, and CHF paid the shortage. Thereafter, Plaintiffs' mortgage payments were greatly increased in order to repay the amounts advanced, and create a larger escrow account. Once the interest rate reset, Plaintiffs' mortgage payments had increased from an original amount of about $2,874 (including escrows) to almost $4,000.00 per month. Plaintiffs were not able to sustain their payments at this outrageous amount.

At closing Chase Bank provided a Notice of Assignment, Sale or Transfer of Servicing Rights, wherein servicing rights were transferred to JPMorgan Chase Bank, N.A. c/o CHF (See Exh D attached). Although that notice states that the transfer is effective on October 1, 2005, it also states that Chase Bank will not receive any payments on the loan after August 31, 2005, being the date of closing.

On February 7, 2008 Plaintiffs' property was sold at Sheriff's sale, with the property reverting back to Chase Bank. (See Exh E). The redemption period will expire on February 7, 2009.

## COUNT I
## CHAIN OF TITLE NOT ESTABLISHED

8.    Plaintiffs incorporate paragraphs 1-7 above, as if fully set forth herein.

9.     Defendant has failed to show a proper chain of title for the subject property, as required by MCL 600.3204 (1) and (3) which state in pertinent part as follows:

*(1)  A party may foreclose a mortgage by advertisement if all of the following circumstances exist:*

*(d)  The **party foreclosing the mortgage is either the owner of the indebtedness or of an interest in the indebtedness** secured by the mortgage or the servicing agent of the mortgage.*

*(3) If the party foreclosing a mortgage by advertisement is not the  original mortgagee, a **record chain of title shall exist prior to the date of sale** under section 3216 evidencing the assignment of the mortgage to the party foreclosing the mortgage.*

10.     CHF is a servicing company, and is not the owner of the indebtedness. Thus, it initially qualifies under MCL 600.3204 (1) (d), to foreclose by advertising on the subject property.

11.     However, CHF is not the original mortgagee (original mortgagee being Chase Bank).  It therefore must show evidence of a proper chain of title pursuant to MCL 600.3204 (3) above.  Defendant is an assignee servicer, which is not the same as an assignee mortgagee. A mortgage servicer only has the right to collect on behalf of the mortgagee.  A mortgagee is the entity to whom the debt is owed…that is a mortgagee is the holder of the note secured by the mortgage.

5

12.     Based on the fact that an increasingly growing number of mortgages are sold into asset-backed mortgage pools, it is Plaintiffs' belief that this is the case with their mortgage. As such, the foreclosing party, CHF, must disclose the identity of the mortgagee for whom it provides servicing.  The alleged mortgagee must then provide the original Note for inspection by Plaintiffs.

13.     If Chase Bank has not sold the subject mortgage, the Note should still be in its possession, and it should encounter no problem with locating the original note and providing it to Plaintiffs for inspection.

14.     CHF does not have a statutory right to foreclose on the subject property for the following reasons:

    a.  CHF has not produced THE ORIGINAL PROMISSORY NOTE for inspection by Plaintiffs,

    b.   CHF is the mortgage servicer, and is not the owner of the indebtedness,

    c.  the subject mortgage was in all likelihood sold into a mortgage pool, and the true holder of the note/indebtedness must be  determined,

    c. CHF is not the original mortgagee.  As such CHF must show a proper chain of title, and should be made to identify the mortgage holder in order to show it is entitled to bring this foreclosure action,

    d.  Plaintiffs have a right to know who is the holder of the Note and mortgage on their home,

e. Because CHF failed to show the proper chain of title, it

therefore had no right to foreclose on the subject property, and that

foreclosure is void ab initio.

f. In an unpublished opinion, the Michigan Court of Appeals, in

Davenport v HSBC Bank USA, LC No. 06-617273-CH, was decided on

April 24, 2007.  In vacating the foreclosure proceedings, the court held,

"...Our Supreme Court has explicitly held that" [o]nly the record holder of

the mortgage has the power to foreclose" under MCL 600.3204. Arnold v

DMR  Financial Services, Inc, 488 Mich 671,678;532 NW2d 852 (1995).

It follows from this pronouncement that the one who is not the record

holder of a mortgage  may not foreclose..." It further went on to say, "

Because defendant lacked the statutory ability to foreclose, the foreclosure

proceedings were **void ab initio** (emphasis  added)"


g. According to standard terms and conditions relative to a pool of

mortgages, certain defaulted notes are required to be replaced, bought

back or paid off by the selling creditor.  There is a substantial likelihood,

that the subject loan is perhaps no longer in the undesignated pool of

mortgages. Moreover, there may not be an assignment which evinces that

the subject loan was in the relative pool ab initio.  Such conduct could be

plausibly construed as fraud and/or deception.

h.  Although Michigan law provides for judicial foreclosure, the great

majority of foreclosures are conducted pursuant to advertisement.  As

7

such, homeowners are at a distinct disadvantage.  In a judicial foreclosure, the foreclosing party would be required to produce the original promissory note for inspection.  However, because this is not required of parties foreclosing by advertisement, homeowners are stripped of their right to know who holds their mortgage.

WHEREFORE, Plaintiffs pray that the court compel Defendants to produce the original promissory note in this matter for inspection by Plaintiffs.  Plaintiffs further pray that the sheriff's sale which was held on February 7, 2008, be set aside, as CHF has not shown that it has the legal authority to initiate foreclosure proceedings on the subject property.

## .COUNT II
## QUIET TITLE

15.   Plaintiffs incorporate paragraphs 1-14 above, as if fully set forth herein.

16.    Plaintiffs are entitled to have the sheriff's sale set aside, and title quieted in Plaintiffs.

## COUNT III
## FRAUD IN THE INDUCEMENT

17. Plaintiffs incorporate paragraphs 1–16 above, as if fully set forth herein. by reference herein.

18. The original mortgagee, Chase Bank, through its agent CLS Lending, made misrepresentations to Plaintiffs, as set forth above, including but not limited to statements that they would act in their best interest, obtain a loan which would be to their benefit, and provide a loan with a fixed rate of interest.

8

19. The original mortgagee, Chase Bank, through its agent CLS Lending and its agents or employees also misrepresented the amount it was charging Plaintiffs for its purported services.

20. The original mortgagee, Chase Bank, through its agent CLS Lending misrepresented the terms and finance charges imposed on the loan, when they told Plaintiffs they would receive a fixed rate loan.

21. The original mortgagee, Chase Bank, through its agent CLS Lending misrepresented the import and contents of the documents which they asked Plaintiffs to sign, and concealed the terms of the loan while requiring Plaintiffs to sign the documents.

22. The original mortgagee, Chase Bank, and CLS Lending entered into a conspiracy to defraud Plaintiffs by agreeing to the payment of a kickback (the ''yield spread premium'') in the amount of $4,145.80  from Chase Bank to CLS Lending for the purpose of getting Plaintiffs to accept the loan at a higher rate than Chase Bank was prepared to impose, without disclosing to Plaintiffs the purpose and nature of the kickback (See Exh F attached).

23. The misrepresentations were material in nature, as they concerned the basic terms and benefits of the loan.

24. CLS Lending and its employee agents knew that their representations were false at the time they were made.

25. Chase Bank knew that its Truth In Lending disclosures were inaccurate. Chase Bank's agent, CLS Lending, knew that representations to Plaintiffs at the closing were false.

9

26. The misrepresentations and omissions were made with the intent to induce Plaintiffs' reliance and thereby to enter into the transaction.

27. Plaintiffs reasonably relied on Chase Bank, and CLS Lending 's misrepresentations to their detriment.

28. CHF knew that the loan terms had been misrepresented to Plaintiffs, and knew that the Truth In Lending disclosures given to Plaintiffs were inaccurate. Such inaccuracy was apparent on the face of the documents assigned to CHF as the servicer.

29. CHF accepted assignment of the servicing rights with notice that the documents contained therein were inaccurate, and that the loan violated Federal and state laws. Therefore, CHF is subject to the defense of fraud raised herein.

30. CHF is liable for all claims and defenses that can be raised against its assignor.

Wherefore, Plaintiffs pray that this Court set aside Defendant's foreclosure sale against Plaintiffs, which was held on February 7, 2008, or, in the alternative, reduce the amount owed by Plaintiffs by the amount of their damages.


## COUNT IV
## MICHIGAN CONSUMER PROTECTION ACT

31. Plaintiffs incorporate paragraphs 1–30 above, as if fully set forth herein. by reference herein.

32. This defense is asserted pursuant to the Michigan Consumer Protection Act, MCL 445.901-445.922.

33. The original mortgagee, Chase Bank, through its agent CLS Lending and its employees and/or agents made misrepresentations to Plaintiffs, as set forth above,

including but not limited to statements that they would act in their best interest, obtain a loan which would be to their benefit, and provide a fixed rate of interest.

34. CLS Lending its agents or employees also misrepresented the amount it was charging Plaintiffs for its purported services.

35. Chase Bank( the original mortgagee) misrepresented the terms and finance charges imposed on the loan.

36. CLS Lending's employee misrepresented the import and contents of the documents which they asked Plaintiffs to sign, and concealed the terms of the loan while requiring Plaintiffs to sign the documents.

37. The original mortgagee, Chase Bank, and CLS Lending entered into a conspiracy to defraud Plaintiffs by agreeing to the payment of a kickback (the ''yield spread premium'') from Chase Bank to CLS Lending for the purpose of getting Plaintiffs to accept the loan at a higher rate than Chase Bank was prepared to impose, without disclosing to Plaintiffs the purpose and nature of the kickback (See Exh F attached)

38.  The misrepresentations were material in nature, as they concerned the basic terms and benefits of the loan.

39. CLS lending and its employee agents knew that their representations were false at the time they were made.

40. Chase Bank knew that its Truth In Lending disclosures were inaccurate. Chase Bank's agent, CLS Lending, knew that representations to Plaintiffs at the closing were false.

41. The misrepresentations and omissions were made with the intent to induce Plaintiffs reliance, and thereby to enter into the transaction.

11

42. Plaintiffs reasonably relied on Chase Bank and CLS Lending's misrepresentations to their detriment.

43.  Chase Bank and CLS Lending have extensive experience and sophistication in transactions involving residential mortgages.

44. Conversely, Plaintiff John Coleman is a homeowner who is inexperienced and unsophisticated in matters involving consumer lending. Plaintiff Beatriz Coleman, while a licensed attorney, had not actively practiced law in the state of Michigan since 1989 (when she was employed by a law firm for only two years, and dealt in matters such as divorce, personal injury and general contract law), and only began a study of consumer lending as a result of the foreclosure action on her home.

45. The fees charged to Plaintiffs far exceed the fees normally charged to consumers in home mortgage transactions.

46. In addition to the fees paid by Plaintiffs for the loan, Chase Bank paid an illegal kickback to the mortgage broker of $4, 145.80 in violation of MCL 445.1673 (23) (1) and MCL 445.901- 445.922.

47. Furthermore, Chase Bank failed to provide accurate Truth In Lending disclosures.

48. Finally, the mortgage that Chase Bank entered into with Plaintiffs increased their interest rate by way of an undisclosed yield spread premium, and provided them with absolutely no real economic benefit.

49. Chase Bank's practices as described above are unfair, immoral, unethical, and unscrupulous.

50. Theses practices offend public policy.

12

51. As a result of Chase Bank's unfair practices, in violation of the Michigan Consumer Protection Act, MCL 445.901-445.922., Plaintiffs suffered substantial injury in that they are now faced with the loss of their home.

52. CHF is liable for all claims and defenses that can be raised against original mortgagee, Chase Bank.

53. On information and belief, based on documents found in Defendants' loan files, Defendants knew that the terms of the loan had been misrepresented to Plaintiffs.

54. CHF knew that the Truth In Lending disclosures given to Plaintiffs were inaccurate. Such inaccuracy was apparent on the face of the documents assigned to CHF as servicer.

WHEREFORE, Plaintiffs pray that this Court set aside Defendant's foreclosure sale against Plaintiffs, which was held on February 7, 2008, or, in the alternative, reduce the amount owed by Plaintiffs by the amount of their damages available under MCL 445.901- 445.922.

### COUNT V RECOUPMENT
### VIOLATION OF THE MICHIGAN MORTGAGE
### BROKERS, LENDERS ANS SERVICERS ACT

55. Plaintiffs incorporate paragraphs 1–54 above, as if fully set forth herein. by reference herein.

56. As part of the transaction, Plaintiffs paid fees to the mortgage broker of at least $7,752.00 for obtaining a loan with an adjustable interest rate that increased their mortgage payments without providing them with any real economic benefit.

57. In exchange for submitting an above-par-rate loan, Chase Bank paid the mortgage broker $4,145.80 ( *See* Exh F attached). This payment was in addition to the

money paid by Plaintiffs, and was not for any services provided by the mortgage broker to Chase Bank.

58. The mortgage broker was more than adequately compensated for its services by Plaintiffs.

59. The mortgage broker provided no goods or services for this fee.

60. Chase Bank's payment of this fee to the mortgage broker violates MCL 445.1631 et seq.'s  prohibition against providers of settlement services from paying referral fees and kickbacks.

61. Plaintiff's violation of the Mortgage Brokers, Lenders and Servicers Act, MCL 445.1651- 445.1684 is a violation that subjects Plaintiff to a civil penalties.

WHEREFOR, Plaintiffs pray that this Court set aside Defendant's foreclosure sale against Plaintiffs, which was held on February 7, 2008., or, in the alternative, reduce the amount owed by Plaintiffs by the amount of their damages available under MCL 445.1651-445.1684.

### INJUNCTIVE RELIEF

62.     Plaintiffs incorporate paragraphs 1-61 above, as if fully set forth herein.

63.     Pursuant to MCR 3.310 B, Plaintiffs request that this court issue an emergency ex-parte temporary restraining order to immediately enjoin and restrain Defendant, directly and indirectly, whether alone or in concert with others, including any officer, agent, employee, and/or representative , until further order of this court, from finalizing its foreclosure process against Plaintiffs' home.

, 64.     Pursuant to MCR 3.310 A, Plaintiffs request that if an emergency ex-parte temporary restraining order is not signed, or if one is issued and expires, that a Preliminary Injunction to immediately enjoin and restrain Defendant, directly and indirectly, whether alone or in concert with others, including any officer, agent, employee, and/or representative , until further order of this court, from finalizing its foreclosure process against Plaintiffs' home, and order Defendant to show cause why a preliminary injunction should not be issued.

65.     This motion is filed because Plaintiffs believe they will and should prevail on the merits, that the affidavits and representations of counsel in instituting this foreclosure were false, and known to be false when made.

66.     Plaintiffs are threatened with immediate homelessness and loss of their investment in their home, all based on conduct in violation of state laws.

67.     Plaintiffs will suffer irreparable harm if they are displaced from their home pending a resolution of their legal and equitable claims in this court

68.     Staying any foreclosure and eviction proceeding pending the adjudication of this case will not harm Defendants, and in fact, the property is protected from potential vandalism and harm rather than being left empty through foreclosure.

69.     Plaintiffs have established a legitimate basis for injunctive relief in the form of a stay of all foreclosure proceedings and eviction until the adjudication of their claims. Plaintiffs are likely to succeed on the merits since Plaintiffs will be able to clearly show that they were not in default, and the foreclosure was wrongful.

70.     Plaintiffs have no adequate remedy at law.

15

71.     Any delay in the issuance of a temporary restraining order until the hearing on a preliminary injunction will result in the following immediate and irreparable harm: homelessness of Plaintiffs, and loss of their investment in their home.

### RELIEF SOUGHT

WHERFORE, Plaintiffs request that this Honorable Court:

A.      Provide the injunctive relief as requested in paragraphs 62-71 above, and stay all foreclosure proceedings and proceedings for possession of property located at 9464 N. Platt Rd., Milan, MI 48160 pending a resolution of Plaintiffs' legal and equitable claims for relief.

B.      Immediately enjoin and restrain Defendant, directly and indirectly, whether alone or in concert with others, including any officer, agent, employee, and/or representative , until further order of this court, from  finalizing its foreclosure process against Plaintiffs' home.

C.      Order that Defendant show cause before this court, why a preliminary injunction should not be ordered according to the terms and conditions set forth above.

D.      Set aside the sheriff's sale which was wrongfully conducted on February 7, 2008.

E.      Provide for actual and statutory damages.

F.      Provide for Attorney Fees and costs

G.      Provide such other relief as it deems appropriate.

16

**JURY DEMAND**

Plaintiffs demand a trial by jury of all issues so triable.


**VERIFICATION**

I, the undersigned, certify and declare that I am a party to this action.  I have read the

foregoing Complaint and know of its contents.  The matters stated in the Complaint are

true of my knowledge except as to those matters stated on information and belief, and as

to those matters I believe them to be true.

Executed on this 6th day of February, 2009 at Milan, Michigan


_____
Beatriz H. Coleman


Respectfully Submitted:

_____
Beatriz H. Coleman, Esq.  (P40188)
Attorney for Plaintiffs
9464 N. Platt Rd.
Milan, MI 48160
Phone: 734.429.1346

17

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

## VERIFICATION

I, the undersigned, certify and declare that I am a party to this action.  I have read the

foregoing Complaint and know of its contents.  The matters stated in the Complaint are

true of my knowledge except as to those matters stated on information and belief, and as

to those matters I believe them to be true.

Executed on this 6th day of February, 2009 at Milan, Michigan

_____
Beatriz H. Coleman

Respectfully Submitted:

_____
Beatriz H. Coleman, Esq.  (P40188)
Attorney for Plaintiffs
9464 N. Platt Rd.
Milan, MI 48160
Phone: 734.429.1346

17

01/24/2008  14:21   7349443494          BEA COLEMAN          PAGE  17

# MORTGAGE

Return To:
DET458040
Chase USA c/o CHF, LLC

Att: Document Control, Dept. 400  10790 Rancho Bernardo Rd.
San Diego, CA 92127.

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated August 31, 2005 ,
together with all Riders to this document.

(B) "Borrower" is  BEATRIZ H COLEMAN and JOHN T COLEMAN

Borrower's address is 9464 N PLATT RD, Milan, MI  48160

. Borrower is the mortgagor under this Security Instrument.
1890177580

MICHIGAN-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3023 1/01

-6(MI) (0005)
Page 1 of 15          Initials:

VMP MORTGAGE FORMS - (800)521-7291

01/24/2008   14:21   7349443494                    BEA COLEMAN                    PAGE   18

(C) "Lender" is Chase Bank USA, N.A.

Lender is a National Association
organized and existing under the laws of United States
Lender's address is 200 White Clay Center Drive
Newark, DE  19711
Lender is the mortgagee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated August 31, 2005
The Note states that Borrower owes Lender Four Hundred Fourteen Thousand
Five Hundred Eighty and 00/100ths                                     Dollars
(U.S. $414,580.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than September 01, 2035
(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(K) "Escrow Items" means those items that are described in Section 3.
(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

1890177580                          Initials: _____      Form 3023 1/01

Page 2 of 15

-6(MI) (0005)

01/24/2008  14:21    7349443494                    BEA COLEMAN                              PAGE   19

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, warrant, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the COUNTY                                    [Type of Recording Jurisdiction]
of Monroe                                    [Name of Recording Jurisdiction]:
See Attached Schedule A

Parcel ID Number:                                   which currently has the address of
9464 N PLATT RD                                                          [Street]
Milan
("Property Address"):                    [City] , Michigan  48160-0000  [Zip Code]

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."
    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

1890177580

Initials: _____

Page 3 of 15                                                          Form 3023  1/01

-6(MI) (0005)

al.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. ~~Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.~~ Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any;

1890177580

Initials: _CHC  TC_

-6(MI) (8005)              Page 4 of 15                              Form 3023 1/01

(c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

1890177580

-6(MI) (0005)                      Page 5 of 15                    Initials: _____      Form 3023 1/01

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the

1890177580

01/24/2008  14:21    7349443494                    BEA COLEMAN                              PAGE  23

work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

1890177580

Initials: _____

-6(MI) (0005)                        Page 7 of 15                              Form 3023 1/01

01/24/2008  14:21    7349443494                    BEA COLEMAN                    PAGE  24

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

1890177580

Initials: _____

-6(MI) (0005)                          Page 8 of 15                          Form 3023 1/01

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if

1890177580

Initials: _____

-6(MI) (0005)                              Page 9 of 15                              Form 3023 1/01

acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly

1890177580

-6(MI) (0005)                              Page 10 of 15                    Initials: _____              Form 3023 1/01

01/24/2008  14:21    7349443494                BEA COLEMAN                    PAGE    27

notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and

-6(MI) (0005)                                                                Form 3023 1/01

(d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any

1890177580

Initials: ___

-6(MI) (0005)                          Page 12 of 15                          Form 3023 1/01

Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS.  Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.**  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise).  The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property.  The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale.  If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give notice of sale to Borrower in the manner provided in Section 15. Lender shall publish and post the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Release.**  Upon payment of all sums secured by this Security Instrument, Lender shall prepare and file a discharge of this Security Instrument. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

1890177580

Initials: _____

-6(MI) (0005)                     Page 13 of 15                                Form 3023 1/01

31

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                    BEATRIZ H COLEMAN          -Borrower

_____          _____ (Seal)
                                    JOHN T COLEMAN             -Borrower

_____ (Seal)   _____ (Seal)
                -Borrower                               -Borrower

_____ (Seal)   _____ (Seal)
                -Borrower                               -Borrower

_____ (Seal)   _____ (Seal)
                -Borrower                               -Borrower

1890177580

-6(MI) (0005)                Page 14 of 15                Form 3023 1/01

STATE OF MICHIGAN,                           OAKLAND      County ss:

    The foregoing instrument was acknowledged before me this AUGUST 31, 2005
by BEATRIZ H COLEMAN and JOHN T COLEMAN

My Commission Expires: 9-17-2011

                                         _____
                                              Notary Public
                                                        WAYNE  County, Michigan

This instrument was prepared by
Winston, Koratica

                    Jakeema Roberson
                    Notary Public, Wayne County
                    My Commission Expires Sep.17, 2011
                    Acting In: OAKLAND

                    18901.77580

                                              Initials: BHC JTC

-6(MI) (0005)              Page 15 of 15                  Form 3023 1/01

Appendix A

A PARCEL OF LAND IN THE NORTHEAST 1/4 OF SECTION 10, TOWN 4 SOUTH, RANGE 6 EAST, YORK TOWNSHIP, WASHTENAW COUNTY, MICHIGAN, DESCRIBED AS: BEGINNING AT A POINT ON THE EAST AND WEST 1/4 LINE OF SAID SECTION 10, DISTANT SOUTH 89 DEGREES 16 MINUTES 55 SECONDS WEST 747.18 FEET FROM THE EAST 1/4 CORNER OF SAID SECTION 10: THENCE FROM SAID POINT OF BEGINNING ALONG SAID EAST AND WEST1/4 LINE SOUTH 89 DEGREES 16 MINUTES 55 SECONDS WEST 331.80 FEET; THENCE NORTH 00 DEGREES 43 MINUTES 05 SECONDS WEST 180.00 FEET; THENCE NORTH 66 DEGREES 00 MINUTES 17 SECONDS EAST 280.45 FEET; THENCE NORTH 89 DEGREES 16 MINUTES 55 SECONDS EAST 825.00 FEET; THENCE DUE SOUTH 66.00 FEET ALONG THE EAST LINE OF SAID SECTION 10 SAID LINE ALSO BEING THE CENTERLINE OF PLATT ROAD (66 FEET WIDE), THENCE SOUTH 89 DEGREES 16 MINUTES 55 SECONDS WEST 750.00 FEET; THENCE DUE SOUTH 00 DEGREES 43 MINUTES 05 SECONDS EAST 224.83 FEET TO THE POINT OF BEGINNING.

PARCEL NUMBER 5-19-10-100-027

COMMONLY KNOW AS 9464 NORTH PLATT ROAD, MILAN, MICHIGAN 48160

01/24/2009  14:42    7349443494                BEA COLEMAN                          PAGE  14

1890177580

# ADJUSTABLE RATE NOTE
### (LIBOR Index–Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

August 31, 2005                                                    Date
SOUTHFIELD, MI                                                    City, State
9464 N PLATT RD, Milan, MI   48160                                Property Address

**1. BORROWER'S PROMISE TO PAY**
    In return for a loan I have received, I promise to pay U.S. $ 414,580.00
Four Hundred Fourteen Thousand Five Hundred Eighty and 00/100ths
(this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
Chase Bank USA, N.A.
a National Association      organized and existing under the laws of United States
I will make all payments under this Note in the form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**
    Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of Five and 875/1000
5.875                                                                      %.

The interest rate I will pay will change in accordance with Section 4 of this Note.
    The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**
    **(A) Time and Place of Payments**
    I will pay principal and interest by making payments every month.
    I will make my monthly payments on the 1st    day of each month beginning on October 01, 2005
. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on September 01, 2035       , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
    I will make my monthly payments at 300 Tice Boulevard, 3rd Floor North
Woodcliff Lake, NJ 07677
or at a different place if required by the Note Holder.
    **(B) Amount of My Initial Monthly Payment**
    Each of my initial monthly payments will be in the amount of U.S. $ 2,452.40
Two Thousand Four Hundred Fifty-Two and 40/100ths
This amount may change.
    **(C) Monthly Payment Changes**
    Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
    **(A) Change Dates**
    The interest rate I will pay may change on the 1st    day of September, 2007                       ,
and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."
    **(B) The Index**
    Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."
    If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

MULTISTATE LIBOR ARM NOTE
BC-6732   Page 1 of 3  (3/05)   (replaces 9/03)

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Six and 125/1000 percentage points (6.125                    %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than Eight and 875/1000 8.875                                                                          %. or less than Five and 875/1000 5.875                                                                          %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one and a half percentage points (1.5%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than Twelve and 875/1000 12.875                                                                          %. and will never be lower than Six and 125/1000 6.125                                                                          %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The Notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use all of my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments    See Attached Rider**

If the Note Holder has not received the full amount of any monthly payment by the end of XX calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be XX                              % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

01/24/2008　14:42　7349443494　　　　　BEA COLEMAN　　　　　PAGE　16

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

| | | | |
|---|---|---|---|
| _____ (signature) Borrower/ BEATRIZ H COLEMAN | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |

MULTISTATE LIBOR ARM NOTE
BC-6732　Page 3 of 3　(3/05)　(replaces 9/03)

01/24/2008  14:42   7349443494                    BEA COLEMAN

Loan Number: 1890177580

## PREPAYMENT RIDER TO NOTE

**NOTICE TO BORROWER:** Do not sign this loan agreement before you read it. This loan agreement provides for the payment of a penalty if you wish to repay the loan prior to the date provided for repayment in the loan agreement.

This PREPAYMENT RIDER TO NOTE amends that certain Note dated **August 31, 2005**                    and executed by BEATRIZ H COLEMAN

("Borrower(s)") in connection with a loan made by
Chase Bank USA, N.A.
("Lender"). This PREPAYMENT RIDER TO NOTE, which is executed as of the same date as the Note, is made a part of the Note. All defined terms have the same meaning as defined in the Note.

A. Section 4 if Fixed Rate Note, or Section 5 if Adjustable Rate Note ("BORROWER'S RIGHT TO PREPAY") is deleted and replaced in its entirety by the following:

I have a right to make payments of principal at any time before they are due. A payment of principal only before it is due is known as a "prepayment". When I make a prepayment, I will tell the Note Holder in writing that I am doing so. I may make full prepayment or partial prepayment, subject to the following conditions:

**3**          **YEAR OPTION.** If, within the first **3**          year(s) after the date of this Note I should prepay this Note in full or in part, I shall pay to the Note Holder a prepayment premium equal to six (6) months' advance interest on the amount prepaid in excess of 20 percent of the original principal balance in any 12 month period measured from the Note date or anniversary thereof. [For 5-year option only] If I prepay during the fourth and fifth years, I will be charged a prepayment penalty premium equal to three (3) months' advance interest on the amount prepaid in excess of 20 percent of the original principal balance. For this purpose, advance interest shall be calculated at the rate in effect on the date of full or partial prepayment.

After 3          years from the date of this Note, I may prepay in part or in full without payment of any premium.

The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the amounts or the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. If my loan is an Adjustable Rate loan, my partial prepayment will, however, reduce the amount of my monthly payments after the first Change Date following my partial prepayment, unless the reduction due to my partial prepayment is offset by an interest rate increase.

**IF MY LOAN IS SECURED BY PROPERTY LOCATED IN NEW YORK,** a prepayment penalty may only be charged during the first year of my loan. In addition, a prepayment penalty may be charged on Adjustable Rate loans only if the initial interest rate remains fixed for at least 5 years.

B. Except for the changes set forth in the PREPAYMENT RIDER TO NOTE, all terms of the Note remain in full force and effect.

WITNESS the Hand(s) and Seal(s) of the Undersigned.

_____ 8/31/05          _____
Borrower                  Date             Borrower                  Date
BEATRIZ H COLEMAN

_____ _____          _____
Borrower                  Date             Borrower                  Date

_____ _____          _____
Borrower                  Date             Borrower                  Date

_____ _____          _____
Borrower                  Date             Borrower                  Date

B&C PREPAYMENT RIDER TO NOTE
BC-6715M (3/05) (Replaces BC6715 11/02)

1890177580

# ADJUSTABLE RATE RIDER
### (LIBOR Index - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this **31st**          day of **August, 2005**
, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to **Chase Bank USA, N.A.**
                                                                                (the "Lender")
a **National Association**          organized and existing under the laws of **United States**
of the same date and covering the property described in the Security Instrument and located at:
**9464 N PLATT RD**
**Milan, MI  48160-0000**
(Property Address)

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:
**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of **Five and 875/1000**
**5.875**                                                                          %.

MULTISTATE LIBOR ARM RIDER
BC-8733.LT  (9/03)  Page 1 of 3 (replaces 1/01)

The Note provides for changes in the interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A)  Change Dates**

The interest rate I will pay may change on the 1st   day of September, 2007 and on that day every sixth month thereafter. Each date on which my interest rate could change is called "Change Date".

**(B)  The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called "Current Index".

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C)  Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Six and 125/1000 percentage points (6.125           %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D)  Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 8.875                                                                                                          % or less than  5.875

                                                                                                                                  %.
Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one and a half percentage points (1.5%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 12.875                                                                                                        % and will never be lower than  6.125                                                                    %.

MULTISTATE LIBOR ARM RIDER
BC-6733.LT  (9/03)  Page 2 of 3 (replaces 1/01)

**(E)  Effective Date of Changes**
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment after the Change Date until the amount of my monthly payment changes again.

**(F)  Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

| | | |
|---|---|---|
| Borrower **BEATRIZ H COLEMAN**   8/31/05   Date | | Borrower **JOHN T COLEMAN**   31 AUG 05   Date |
| Borrower _____ Date | | Borrower _____ Date |
| Borrower _____ Date | | Borrower _____ Date |
| Borrower _____ Date | | Borrower _____ Date |

MULTISTATE LIBOR ARM RIDER
BC-6733.LT  (9/03) Page 3 of 3 (replaces 1/01)

## CHASE HOME FINANCE
## SUBPRIME LENDING

### INTEREST ONLY PRODUCT AND CREDIT MATRIX

## NOTICE OF ASSIGNMENT, SALE OR TRANSFER
## OF SERVICING RIGHTS

Date: August 31, 2005

Loan #: 1890177580

You are hereby notified that the servicing of your loan, that is, the right to collect payments from you, is being assigned, sold or transferred:

    from:  Chase Bank USA, N.A.
    to: JPMorgan Chase Bank, N.A.
    effective: 10/01/2005

The assignment, sale or transfer of the servicing of the loan does not affect any term or condition of the mortgage documents/security instruments, other than terms directly related to the servicing of your loan.

Except in limited circumstances, the law requires that your present servicer send you this notice at least 15 days before the effective date of transfer, or at closing. Your new servicer must also send you this notice no later than 15 days after this effective date or at closing. In this case, all necessary information is combined in this one notice.

Your present servicer is Chase Bank USA, N.A.

If you have any questions relating to the transfer of servicing from your present servicer you may contact your present servicer at the address and phone number listed below. If the phone number does not contain a toll-free area code, you may call collect.

300 Tice Boulevard
Woodcliff Lake, NJ 07677
(800) 435-9922

Your new servicer will be JPMorgan Chase Bank, N.A.
The address for forwarding correspondence other than payments and toll-free telephone number for your new servicer are:
JPMorgan Chase Bank, N.A.
c/o Chase Home Finance, LLC
P.O. Box 509011 San Diego, CA 92150-9011
1-(800) 548-7912 6:00 A.M. TO 6:00 P.M. Pacific Time Monday Through Friday

The date that your present servicer will stop accepting payments from you is 08/31/2005
The date that your new servicer will start accepting payments from you is 08/31/2005
Send all payments due on or after this date to your new servicer at the address indicated on the monthly statement / coupon book the new servicer will send you. If you do not receive a monthly statement / coupon book prior to your first scheduled due date, make your check payable to your new servicer and mail it to:

JPMorgan Chase Bank, N.A.
c/o Chase Home Finance, LLC
10790 Rancho Bernardo Road  San Diego, CA, 92127
Attn: Financial Processing

You should also be aware of the following information, which is set out in more detail in Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. 2605):

BEA COLEMAN

During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

Section 6 of RESPA (12 U.S.C. 2605) gives you certain consumer rights. If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgment within 20 business days of receipt of your request. A "qualified written request" is written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and your reasons for the request. If you want to send a "qualified written request" regarding the servicing of your loan, it must be sent to this address:

JPMorgan Chase Bank, N.A.
c/o Chase Home Finance, LLC
P.O. Box 509011 San Diego, CA 92150-9011
Attn: Dept 310

Not later than 60 business days after receiving your request, your servicer must make any appropriate corrections to your account, and must provide you with a written clarification regarding any dispute. During this 60 business day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent the servicer from initiating foreclosure if proper grounds exist under the mortgage documents/security instruments.

A business day is a day on which the offices of the business entity are open to the public for carrying on substantially all of its business functions.

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section. You should seek legal advice if you believe your rights have been violated.

I/We acknowledge receipt of this Notice.

_____  8/31/05
BEATRIZ H COLEMAN            Date                                          Date

_____            _____
                Date                                          Date

_____            _____
                Date                                          Date

_____            _____
                Date                                          Date

Notice of Assignment, Sale or Transfer
C7028 (1/05) (replaces 9/03)  Page 2 of 2

01/13/2009  15:13   17343225896          PAT WHITE                    PAGE  02

OFFICIAL SEAL          Washtenaw Co., MI
02/20/08  Lawrence Kestenbaum
L-4666 P-414    Clerk Register

Page: 1 of 6

ACO-5300008-09-2008-6          02:22 P
Lawrence Kestenbaum, Washtenaw          02/20/08

L-4666  P-414

35440

177344F01 Coleman - FC S

### SHERIFF'S DEED ON MORTGAGE SALE

This indenture Made this 7th day of February, A.D. 2008, between, **Jimmy F Moore**, Deputy Sheriff in and for Washtenaw County, Michigan, whose address is 2201 Hogback Rd Ann Arbor, Michigan 48105-9732 , party of the first part, and Chase Bank USA, N.A., whose address is 10790 Rancho Bernardo Rd, San Diego, CA 92127-5705 , party of the second part (hereinafter called the grantee).

WITNESSETH, That Whereas a certain mortgage made by Beatriz H. Coleman and John T. Coleman, husband and wife, original mortgagor(s), to Chase Bank USA, N.A., Mortgagee, dated August 31, 2005, and recorded on November 1, 2005 in Liber 4518 on Page 346, in Washtenaw county records, Michigan and

WHEREAS, said mortgage contained a power of sale which has become operative by reason of a default in the condition of said mortgage, and

WHEREAS, no suit or proceedings at law or in equity have been instituted to recover the debt secured by said mortgage or any part thereof, and

WHEREAS, by virtue of said power of sale, and pursuant to the statute of the State of Michigan in such case made and provided, a notice was duly published and a copy thereof was duly posted in a conspicuous place upon the premises described in said mortgage, that the said premises, or some part of them, would be sold at 10:00 A.M on the 7th day of February, A.D. 2008, at the Main lobby of the Washtenaw County Courthouse, Huron Street entrance, Ann Arbor, Michigan, that being the place of holding the Circuit Court for Washtenaw County where the premises are situated and

WHEREAS, pursuant to said notice I did, at on the day last aforesaid, expose for sale at public vendue the said lands and tenements hereinafter described, and on such sale did strike off and sell the said lands and tenements to the grantee for the sum of Three Hundred Four Thousand And 00/100 Dollars ($304,000.00), that being the highest bid therefore and the grantee being the highest bidder, and

WHEREAS, said lands and tenements are situated in the Township of York, Washtenaw County, Michigan, more particularly described in exhibit A, attached and commonly known as:
9464 N Platt Rd
Property Tax Parcel ID 5-19-10-100-027
This property may be located within the vicinity of farmland or a farm operation. Generally, accepted agricultural and management practices, which may generate noise, dust, odors, and other associated conditions, may be used and are protected by the Michigan right to farm act.

Now, this Indenture Witnesseth, That I, the Deputy Sheriff aforesaid, by virtue of and pursuant to the statute in such case made and provided, and in consideration of the sum of money so paid as aforesaid, have granted, conveyed, bargained and sold, and by this deed do grant, convey, bargain and sell unto the grantee, its successors and assigns, forever, all the estate, right, title and interest, which the said mortgagor(s) had in said land and tenements and every part thereof, on the 31st day of August, A.D. 2005, that being the date of said mortgage, or at any time thereafter, to have and to hold the said lands and tenements and every part thereof to the said grantee, its successors and assigns forever, to their sole and only use, benefit and behoof forever, as fully and absolutely as I, the Deputy Sheriff aforesaid, under the authority aforesaid, might, could or ought to sell the same.

IN WITNESS WHEREOF, I have hereunto set my hand and seal, the date and year hereinabove written.

Jimmy F Moore
Deputy Sheriff in and for the County of Washtenaw

STATE OF MICHIGAN
COUNTY OF WASHTENAW

On this 7th day of February, A.D. 2008, before me, a Notary Public in and for said County of Washtenaw came Jimmy F Moore , a Deputy Sheriff of said County, known to me to be the individual described in and who executed the above conveyance, and who acknowledged that he executed the same to be his free act and deed as such Deputy Sheriff.

JAIME M. WOODWARD
Notary Public, State of Michigan
County of Washtenaw
My Commission Expires Mar. 22, 2011
Acting in the County of

Jaime M. Woodward
Notary Public, Washtenaw County, Michigan
My commission expires:
Acting in the county of Washtenaw

THIS INSTRUMENT IS EXEMPT FROM MICHIGAN TRANSFER TAX UNDER MCL 207.526(u).

STATE OF Michigan          REAL ESTATE TRANSFER TAX
Washtenaw Co          $334.40-S
02/20/2008
1801          195425

6

File

Lender: Chase Bank USA, N.A.

## Good Faith Estimate of Settlement Costs
Date: August 17, 2005
Loan #: 1880177580

Applicant: BEATRIZ H COLEMAN

Mailing Address: 9464 N PLATT RD  Milan, MI 48160
Loan Type: 2/8 LIBOR ARM
Mortgage Amount: $414,580.00                        Est. Closing Date: 9/18/2005

The information provided below reflects estimates of the charges which are likely to incur at the settlement of your loan. The fees listed are estimates - the actual charges may be more or less. Your transaction may not involve a fee for every item listed.
The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1/HUD-1A Settlement Statement which you will be receiving at settlement. The HUD-1/HUD-1A Settlement Statement will show you the actual cost for items paid at settlement.

### Description of Settlement Charges

| | | Estimated Amount or Range |
|---|---|---|
| 800 | Items Payable in Connection with the Loan | |
| 808 | Tax Service Fee | $69.00 |
| 815 | Yield Spread Premium to Broker 1.000% (SOO) $4145.80 | |
| 816 | Processing Fee | $225.00 |
| 818 | Courier Fee | $30.00 |
| 819 | Flood Determination - Initial | $11.00 |
| 820 | Flood Certification - Life of Loan | $7.00 |
| 826 | Wiring Fee | $30.00 |
| 831 | Credit Report Fee to Broker | $10.89 |
| 840 | Processing Fee to Broker | $520.00 |
| 841 | Underwriting Fee to Broker | $499.00 |
| 842 | Courier Fee Broker | $30.00 |
| 844 | Appraisal Fee to Broker | $500.00 |
| 846 | Loan Origination Fee - Broker | $3106.50 |
| | | |
| 900 | Items Required by Lender to be Paid in Advance | |
| 901 | Interim Interest for 30 days @ $95.13 per day | $2853.79 |
| 903 | Hazard Insurance Premium | $2072.90 |
| | | |
| 1100 | Title Charges | |
| 1101 | Settlement/Closing | $275.00 |
| 1108 | Title Insurance | $914.00 |
| | | |
| 1200 | Government Recording and Transfer Charges | |
| 1201 | Recording Fees/Filing Fee | $75.00 |

These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided by your mortgage broker or lender.

I/We acknowledge I/we have received a copy of the Good Faith Estimate of Settlement Costs, the HUD Special Information Booklet, and if applicable the Consumer Handbook on ARM Mortgages and Truth in Lending ARM Program Disclosures. I/we fully understand the amounts indicated above are estimates only and may vary from the actual settlement charges I/we will be required to pay at closing. Further, I/we fully understand that the estimated amounts provided above are subject to change at any time and without notice.

Applicant
BEATRIZ H COLEMAN                            Date            Applicant                            Date

Applicant                                    Date            Applicant                            Date

Please see attached for required Provider of Services Disclosure.

B/C - GOOD FAITH ESTIMATE OF SETTLEMENT COSTS
C-001BC (4/00)